Filed 5/23/14  In re J.P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065193 |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1061B) |
| v. | |
| LETICIA P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Leticia P. appeals an order terminating her parental rights in the juvenile dependency case of her minor daughter, J.P. Leticia contends substantial evidence does not support the juvenile court's findings that J.P. was likely to be adopted (Welf. & Inst. Code, § 366.26, subd. (c)(1))[1] and the beneficial parent-child relationship exception to adoption did not apply (§ 366.26, subd. (c)(1)(B)(i)). We conclude that the evidence supported the juvenile court's findings and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

On February 1, 2012, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivision (b), on behalf of 11-year-old J.P. The Agency alleged Leticia failed to protect J.P. from Leticia's live-in boyfriend, Victor A., Sr., (Victor) who had sexually abused J.P. on two occasions. After the abuse, Leticia obtained a restraining order against Victor, but she allowed him to violate it by returning to the family home where J.P. also lived. Leticia has been diagnosed with mild mental retardation and has a history of child neglect. Victor is an alcoholic who had a history of physical abuse of J.P. and Leticia's other children. The Agency concluded that J.P. had suffered, or was at substantial risk of suffering, serious physical harm as a result of Leticia's failure or inability to protect her.

Leticia told the Agency that J.P.'s biological father was Juan Z., though the Agency was unable to locate him. Victor is the father of Leticia's other three children, Allen P., Alexis A., and Victor A., Jr. Concurrent with J.P.'s petition, the Agency filed

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

petitions under section 300 on their behalf as well. During J.P.'s dependency case, Leticia gave birth to a fifth child, Liliana A., who was also the subject of an Agency petition under section 300. Victor is the father of Liliana.

At the time of J.P.'s petition, the family was receiving voluntary services from the Agency following J.P.'s disclosure of sexual abuse by Victor. The family had come to the Agency's attention numerous times in the previous decade due to physical abuse and neglect. On two occasions, the children were briefly removed from their parents' care.

At J.P.'s detention hearing, the court found the Agency had made a prima facie showing under section 300, subdivision (b), and ordered that J.P. be detained in out-of-home care. J.P. was placed with her half siblings in the home of their maternal aunt, Josephine P. At the contested jurisdiction and disposition hearing, the court sustained the allegations of the petition, removed J.P. from her parents' custody, and ordered reunification services for Leticia. J.P. remained in the care of Josephine.

Leticia initially made "some progress" in her case plan. However, by the time of the 12-month review hearing in J.P.'s case, the court found Leticia had not made substantial progress, there was not a substantial probability that J.P. would be returned to Leticia by the 18-month date, and termination of Leticia's reunification services was appropriate. The court scheduled a selection and implementation hearing under section 366.26.

In advance of the selection and implementation hearing, the Agency prepared a report concerning the permanent plan for J.P. The Agency recommended that the court terminate Leticia's parental rights and order adoption as J.P.'s permanent plan. The

3

Agency described J.P. as healthy, calm, and friendly. She received average grades in school and was bilingual in English and Spanish. J.P. had some typically adolescent behaviors, such as a dislike of chores and an episode while on vacation in Mexico where she kissed or was kissed by an adolescent boy. But J.P. had no reported behavioral problems and was developmentally on target.

Josephine expressed interest in adopting J.P., and J.P. wanted to be adopted by her. In addition, the Agency identified nine local families and 30 families outside San Diego County that were approved for adoption and willing to adopt a minor with J.P.'s characteristics. At that point, all of Leticia's children were in Josephine's care, with the exception of Victor Jr., who was developmentally delayed.

Leticia initially visited J.P. once or twice per month. Later in J.P.'s dependency case, Leticia began to visit every day except Sundays. Each visit lasted approximately eight hours, and Leticia helped her sister Josephine with cooking and cleaning. Based on the Agency's evaluation, including observation of Leticia's visits, the Agency opined that Leticia did not occupy a parental role in J.P.'s life and that adoption was in J.P.'s best interest. Although Leticia loved J.P., and would like to take on a parental role, she was unable to do so. The Agency never made contact with J.P.'s alleged father Juan.

After the Agency's report, J.P. and Josephine began to fight over household chores and J.P.'s infatuation with a teenager in Tijuana, Mexico. An Agency social worker visited J.P. in Josephine's home. J.P. told the social worker she did not want to be adopted by Josephine or anyone else. J.P. had her bags packed and wanted to move out. The social worker told J.P. there was no reason for her to leave; this was her family. J.P.

4

remained in Josephine's care, but a week later her attitude was the same. Based on J.P.'s statements, the Agency requested a 60-day continuance of the selection and implementation hearing to assess the Agency's recommended permanent plan. The court granted the requested continuance.

In advance of the continued hearing, the Agency submitted an updated report. It again recommended adoption as J.P.'s permanent plan. The Agency noted that J.P. continued to argue with Josephine over her professed love for Brian, the teenager in Tijuana. At other times, however, J.P. was happy. Josephine also found J.P.'s diary, which contained statements about killing herself, killing "the world," wanting to use drugs, and running away with Brian. J.P. was assessed for suicidal ideation, and she was not found at risk. An Agency social worker met with J.P. in person to discuss her permanent plan. Despite the recent friction, J.P. still wanted her aunt to adopt her because she "sees her aunt as her mom." J.P. said she had a talk with her aunt. J.P. understood that she was too young to date Brian, but she was happy they could be friends.

At the contested selection and implementation hearing, the court received the Agency's reports into evidence and heard testimony from an Agency social worker. The social worker testified that J.P. did not have significant interaction with Leticia during her visits at Josephine's home. J.P. directed her attention towards Josephine. While J.P. lived for many years with Leticia, the social worker believed their relationship was negatively affected by Leticia's failure to provide a safe and caring home. J.P.'s counsel

5

joined in the Agency's recommendations. Leticia did not present any affirmative evidence at the hearing.

The court agreed with the Agency's recommendations. At the conclusion of the hearing, the court stated as follows:

> "I find by clear and convincing evidence that it is likely that [J.P.] will be adopted if parental rights are terminated. I note that she is described as follows: that she is healthy. She is developing age appropriately. She is bilingual. She is described as friendly with the exception of her fascination with her [beau] in Tijuana. Otherwise, she is a very sweet girl.
>
> "I do think [J.P.] has—her recent behaviors would be more described as a teenage girl who is dealing with—as her counsel said—her first crush. And other than this issue, she's never had behavioral problems. She is social. She is well-behaved. She is attractive. She has no developmental delays.
>
> "The—the court is relying on—I'm making a finding she is generally adoptable based on—well, provided by the Agency that there are nine local families and 30 out-of-county families approved to adopt a minor with [J.P.'s] characteristics.
>
> "Realistically, it is the court's very strong preference that [J.P.], in terms of adoption be adopted by—I find she is specifically adoptable due to her relationship with, and with the approved adoptive home study with her aunt and caretaker, Josephine [P.] . . . ."

The court further determined whatever bond existed between Leticia and J.P. was greatly affected by Leticia's failure to protect J.P. from Victor and to provide an adequate home. While the court found that Leticia had maintained regular contact with J.P., the quality of that contact did not show a substantial, positive emotional attachment. The beneficial parent-child relationship exception to adoption therefore did not apply. (§ 366.26, subd. (c)(1)(B)(i).)

6

The court found that adoption was in J.P.'s best interests, terminated the parental rights of Leticia and Juan, and ordered adoption as J.P.'s permanent plan. Leticia appeals.

DISCUSSION

I

Leticia first challenges the juvenile court's finding that J.P. was likely to be adopted. "A finding of adoptability requires 'clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time.' [Citation.] The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child. [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.)

"On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child was likely to be adopted within a reasonable time. [Citations.]" (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) " 'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' [Citation.] The 'clear and convincing' standard is for the edification and guidance of the juvenile court. It is not a standard for appellate review. [Citation.]" (*In re J.I.* (2003) 108 Cal.App.4th 903, 911.) " 'Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the

7

appellant's evidence, however strong.' " (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 881.)

"The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts. [Citation.]" (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

Here, the evidence showed that J.P. was a normal, healthy, attractive 13-year-old girl. She was calm, friendly, and social. She had a long history of good behavior and at least average grades in school. Her maternal aunt Josephine wanted to adopt her, and J.P. in turn wanted to be adopted by Josephine. Additionally, the Agency reported that nine local families and 30 families outside San Diego County were willing to adopt a minor with J.P.'s characteristics. From this evidence, the court could reasonably find by clear and convincing evidence that J.P. was likely to be adopted within a reasonable time. (See *In re J.I.*, *supra*, 108 Cal.App.4th at p. 911.) The evidence showed that J.P. was generally adoptable based on her physical and emotional characteristics and specifically adoptable by her aunt Josephine.

Leticia claims that J.P.'s arguments with Josephine make it unlikely she will be adopted. At most, however, the evidence of J.P.'s arguments with Josephine creates a conflict in the evidence, which we must resolve in favor of the court's order. (See *In re J.I.*, *supra*, 108 Cal.App.4th at p. 911.) We may not reweigh the evidence of J.P.'s

adoptability, as Leticia's contention would require. (See *In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

Leticia further claims that J.P.'s adoption by Josephine "fell far short of certain" and that other families may not wish to adopt J.P. given her recent conflicts with Josephine. Leticia maintains that J.P. "could very well decide to object to adoption by the aunt again" and might object to adoption by another family. These arguments rely on speculative inferences inconsistent with the court's finding, which we may not indulge. (See *In re J.I.*, *supra*, 108 Cal.App.4th at p. 911; see also *In re Jose C.* (2010) 188 Cal.App.4th 147, 159 ["We cannot interfere with the juvenile court's ruling based on speculation about what 'may' happen"].) As such, they are unpersuasive.

Leticia also contends that the court lacked sufficient information about J.P.'s emotional and behavioral issues to make an adequate determination of adoptability. We disagree. J.P.'s dependency case had been pending almost two years at the time of the selection and implementation hearing. Over that time, J.P. had no reported behavioral problems. She was a calm, friendly, well-behaved child who was thriving in her aunt Josephine's care. Given this history, there was sufficient evidence for the court to determine that the friction between J.P. and Josephine in the time leading up to the hearing reflected nothing more than normal adolescent rebelliousness. No further inquiry was required. (See *In re Michael G.*, *supra*, 203 Cal.App.4th at pp. 591-593.)

## II

Leticia next challenges the court's finding that the beneficial parent-child relationship exception to adoption did not apply. "If the court determines, . . . by a clear

9

and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) An exception to this general rule applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child . . . ." (§ 366.26, subd. (c)(1)(B).) This exception may be found where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"To overcome the strong policy in favor of terminating parental rights and to fall within [this exception's] purview, the parent must show more than 'frequent and loving contact,' [citation], and be more to the child than a mere 'friendly visitor or friendly nonparent relative.' [Citation.] The parent must show the parent-child bond is a 'substantial, positive emotional attachment such that the child would be greatly harmed' if parental rights were terminated. [Citation.]" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)

The bond between parent and child must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "The factors to be considered include: '(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of

interaction between the parent and the child, and (4) the child's particular needs.' [Citation.]"  (*In re Helen W.*, *supra*, 150 Cal.App.4th at p. 81.)

The parties agree the substantial evidence standard of review applies to the court's finding.  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; but see *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard, but noting little practical difference between the standards].)  "We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling.  [Citation.]  If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights under section 366.26, subdivision (c)."  (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)

Here, the court found that Leticia had satisfied the first prong of the exception and "maintained regular visitation and contact with the child . . . ."  (§ 366.26, subd. (c)(1)(B)(i).)  Regarding the second prong, the evidence showed that Leticia and J.P. interacted very little during Leticia's visits.  Leticia assisted in chores such as cooking and cleaning, but she did not parent J.P.  J.P. turned to Josephine for guidance and instruction, thrived in Josephine's care, and wanted Josephine to adopt her.  While J.P. lived with Leticia most of her life, any parent-child bond from that time was significantly impacted by Leticia's failure or inability to provide a safe and caring home for J.P. and her half siblings.

11

Leticia fails to confront these facts under the applicable standard of review. Instead, she emphasizes contrary inferences from the factual record that allegedly support reversal. Leticia claims generally that she "significantly contributes to [J.P.'s] care and is nearly a constant presence in her life," such that "[a] positive relationship between J.P. and her mother exist[s] and the child would suffer if their relationship were severed." She also claims she was "an integral part of the daily workings and activities in [Josephine's] home." However, these inferences—which are largely speculative—cannot contradict the substantial evidence supporting the court's finding described above.

Unlike the authorities she relies on, Leticia cites little if any evidence that J.P. had a substantial, positive emotional attachment to Leticia at the time of the selection and implementation hearing. (Cf. *In re Amber M.* (2002) 103 Cal.App.4th 681, 689-690 [evidence from psychologist, therapist, and court-appointed special advocate regarding bonding and detriment if parental rights were terminated]; *In re Scott B.* (2010) 188 Cal.App.4th 452, 471-472 ["It is also clear from the record [including testimony by mother, minor, and court-appointed special advocate] that [minor's] emotional makeup will not enable him to endure interruption of his long-standing frequent visits with Mother"].) While J.P. recognizes that Leticia is her biological mother, this recognition alone is insufficient to show the required emotional attachment. In fact, the evidence showed that J.P. wanted to be adopted by Josephine. While not determinative, J.P.'s wishes confirm her lack of attachment to Leticia.

At most, the evidence shows that Leticia was a "friendly visitor" in J.P.'s household. (See *In re Helen W.*, *supra*, 150 Cal.App.4th at p. 81.) Substantial evidence

12

supports the court's finding that the beneficial parent-child relationship exception did not apply. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 557.) Leticia's contrary contention is without merit.

DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

McDONALD, J.

13